## Berger *v.* Public Parking Authority of Pittsburgh, Appellant.

Argued May 25, 1954; reargued June 4, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Ella Graubart,* with her *Patterson, Crawford, Arensberg & Dunn,* for appellant.

*James P. McArdle,* for appellees.

OPINION BY MR. JUSTICE BELL, November 29, 1954:
On February 28, 1951, the Public Parking Authority of Pittsburgh condemned the property of John N. Berger and his wife, known as premises 411-413 Boulevard of the Allies. The property consisted of a lot extending 40 feet on the Boulevard and 20 feet deep,

with a three story building on it. The building, originally a residence of Swiss chalet design, had been converted into an office building.

Berger purchased the property on June 27, 1946. A year later, on July 19, 1947, he entered into a written agreement to sell the property to Edison Speer for *$36,000*. The sale fell through in November, 1947, and the down payment of $2,000. was forfeited. Thereafter, on December 11, 1947, Berger transferred the property to the name of himself and his wife, as tenants by the entireties. At the time of the condemnation the premises were rented for $350. a month. The Board of Viewers awarded $54,560. for the fee simple to the owners of the building (which included detention money to February 1, 1952), and $1,000. to the lessee. Appeals were taken by the Parking Authority and by the owners.

At the trial in the Court of Common Pleas the jury returned a verdict in favor of the owners in the sum of $64,385. (which included detention money at the rate of 4% to April 9, 1953), but nothing for the lessee, although the Court had instructed the jury to return a verdict of $500. for the lessee's removal costs.

The Authority's motion for a new trial was refused, whereupon the Authority appealed.

On behalf of the Authority, Louis Monteverde, a real estate expert, valued the property as of the date of condemnation at $42,500., and Robert Macdowell, a real estate expert, valued it at $45,000. On behalf of the owners, West Brown, a real estate expert, valued the property at $75,000. and Thomas McCaffrey, a real estate expert, valued the property at $72,000.

Counsel for the Authority attempted to cross-examine the *owner* of the property, Mr. Berger, and to examine the purchaser of the property, Mr. Speer, concerning the written agreement of sale dated July 19,

1947 (the settlement date of which was September 1, 1947, later extended to October 31, 1947) for $36,000. The trial Judge refused to permit this cross-examination or examination, and also excluded the aforesaid agreement of sale, on the ground, inter alia, that it was too remote, namely, three years and four months before the condemnation.

Generally speaking, an owner of property may be asked what he paid for the property and similarly the price at which he offered to sell the property, if the purchase or sale was not too remote: *East Brandywine and Waynesburg R. R. Co. v. Ranck,* 78 Pa. 454; *Lutz v. Allegheny County,* 327 Pa. 587, 590, 195 A. 1; *Rea v. Pittsburg & Connellsville Railroad Co.,* 229 Pa. 106, 78 A. 73; *Greenfield v. Philadelphia,* 282 Pa. 344, 127 A. 768.

In *Lutz v. Allegheny County,* 327 Pa., supra, where 78 acres of farm land was condemned for an airport, this Court held that the husband-plaintiff could properly be cross-examined as to the cost of the property which he had bought *7 years* before the condemnation, and said (p. 590) : ". . . *plaintiff could have been asked on cross-examination the direct question as to what he had paid for the property*: Greenfield v. Phila., 282 Pa. 344, 127 A. 768."

In *Greenfield v. Phila.,* 282 Pa., supra, the Court permitted a plaintiff who claimed damages for the taking of his property, to be cross-examined as to the price he paid for it, even though he did not testify on direct examination as to the value of the property and even though "the purchase was made more than a year before the appropriation, *it being alleged that in the meantime the character of the neighborhood had changed and values greatly increased.*"* The Court,

---

\* Italics throughout, ours.

speaking through Mr. Justice (later Chief Justice) SCHAFFER, said, inter alia (pp. 351, 352): "We expressly held in Rea v. Pittsburgh & Connellsville R. R. Co., 229 Pa. 106, 114, that a party plaintiff in a proceeding of the nature which we are now considering may be asked on cross-examination *the price he paid for the property, where the time of the purchase was not too remote from the time of the taking.*"

The *Greenfield* case is on all-fours with the instant case. The *Greenfield* case and the *Rea* case once again reiterate that an owner may be asked on cross-examination the price he paid for his property, where the time of the purchase was not too remote from the time of the taking. It also disposes of and *completely refutes* appellee's contention that a change in the character of the neighborhood and the great increase in value of properties therein between the time of purchase and the time of the taking is a sufficient ground for *entirely excluding* evidence of the purchase or sale price. Of course the owner has the right to explain or deny or rebut this evidence and to offer evidence of a change in the neighborhood or an increase in values of properties therein or any other relevant fact.

In *East Brandywine & Waynesburg Railroad Co. v. Ranck,* 78 Pa., supra, this Court reversed the Court below for excluding offers of plaintiff's declaration of what he valued his land at per acre, and what he was willing to take for it, and what he offered to sell it for two years before. Mr. Justice (later Chief Justice) PAXSON, speaking for the Court, said (pp. 456, 457): "The issue was as to the amount of damages caused to this particular property by the opening of the road. . . . As evidence bearing upon the value of this property, Ranck's own declarations were certainly competent when offered by the company. *His offer of it at a fixed price* and a sale of a portion of it were

facts proper to go to the jury as constituting his esti-mate of its value."

In *Rea v. Pittsburg & Connellsville Railroad Co.,* 229 Pa., supra, this Court reversed the lower Court because it refused to allow the owner to be cross-ex-amined as to the cost of property purchased by him *2 years and 9 months* prior to the condemnation, and said (page 116) : ". . . in Henkel v. Terminal R. R. Co., 213 Pa. 485, 'The good faith of a witness and the accuracy and extent of his knowledge may be tested by questioning him as to particular sales, to ascertain whether he knew of and considered them in forming an opinion. These inquiries go directly to the value of the opinion expressed;' in Gorgas v. Phila., H. & P. R. R. Co., 215 Pa. 501, 'The witness may be asked in cross-examination as to his knowledge of particular sales and the prices asked for property in the commu-nity for the purpose of testing his competency to tes-tify; but such evidence in chief is clearly incompetent;' In Schronhart v. Penna. R. R. Co., 216 Pa. 224, 'Where the witness has testified to value, his good faith and accuracy and the extent of his knowledge may be tested on cross-examination by questioning him as to particu-lar sales of property similarly situated to ascertain whether he knew of them and considered them in form-ing an opinion.' The objection to the admission of testimony of particular sales is placed upon the theory that it would lead to the investigation of 'collateral issues as numerous as the sales:' Pittsburg, etc., R. R. Co. v. Rose, 74 Pa. 362. *It is plain that this does not apply to the admission of testimony concerning a single sale of the very property in controversy."*

The cross-examination sought and the evidence of-fered by the Authority was particularly allowable, competent and relevant in the present case because West Brown, a real estate expert for the owners, tes-

tified that he examined the property and made his appraisal thereof some time in 1948; that at that time his appraisal was $75,000.; that land values in the "Golden Triangle", in which this property was situated, had greatly increased during the last few years, but that his appraisal was the same in 1951 as it was in 1948. We agree with the Authority that if the trial Judge had allowed it to show that Berger, the owner, was ready and willing to sell his property for $36,000. in October, 1947, Brown's 1948 valuation of $75,000. would have appeared so inflated as to make his valuation of the property in February, 1951, unreliable or unworthy of belief.*

Counsel for the owners vigorously contends that the aforesaid agreement of sale and any cross-examination of Berger with respect thereto were inadmissible because of remoteness of time, and because of the large increase in value of the properties situated in the "Golden Triangle" in the last few years. This latter fact goes only to the weight of the evidence and not to its admissibility; it may have great or little weight depending on the facts of the particular case, but it is clearly admissible.

The owners rely mainly on *Berkley v. Jeannette,* 373 Pa. 376, 96 A. 2d 118, to sustain the exclusion of the evidence and the cross-examination of the plaintiff. The facts of that case make it clearly distinguishable. In that case this Court held that a defendant could not cross-examine the husband-plaintiff as to the price he paid for a house and lot 10 months before the

---

* We note parenthetically that the Authority's real estate expert, Monteverde, who did not know of the 1947 agreement of sale between Berger and Spear, appraised the property (1) as of May 28, 1948, at $36,000., and because of the rise in real estate values in the "Golden Triangle" in the next few years, (2) as of February 28, 1951, the date of the condemnation, at $42,500.

condemnation, and to the price he paid for the vacant lot 4 months before the condemnation, where *both the testimony and the issue* dealt with the value of the property *as a whole* at the date of the condemnation. In that case Mr. Justice JONES said (pages 381-2) : ". . . What the defendant's counsel sought to elicit on cross-examination of the husband-plaintiff was not what the plaintiffs had paid for the property *as an integrated whole** but what they had paid for each of the tracts separately at different times. The two sums added together would not have given a figure by which the witness's opinion *of the value of the properties as a whole* at the time of the condemnation could have been impeached. It is not only possible, but probable, that each of the constituent lots took on an increased value *upon its being merged* with the other which was forthwith to be reflected in the value of the properties as a whole . . . ."

For these reasons we hold that the lower Court committed reversible error in excluding the 1947 agreement of sale and in refusing to permit Berger to be cross-examined as to that sale.

The Authority likewise contends that the lower Court erred in refusing to permit the defendant to put in evidence (a) the award of the Board of Viewers, and (b) the tax assessments of the property.

It was assumed by all parties concerned, as well as by the Court below, that the award of the Board of Viewers was inadmissible although no appellate Court authority was cited for this proposition. We are in accord that this is the law. This conclusion appears indirectly in *Fraser v. Pittsburg,* 41 Pa. Superior Ct. 103, 106, where the Court said: "These offers of evi-

---

* Italics ours.

dence [the report of Viewers] were properly rejected by the court below, for the following reasons: (1) The report of viewers was not admissible generally, and the effect of the act of 1903 was only to make it admissible for the specific purpose in the statute designated [where benefits are assessed]; . . .". Cf. also *Philadelphia v. Conway*, 257 Pa. 172, 180, 101 A. 472. Where a case is tried de novo in the Court of Common Pleas, to permit the introduction of such evidence would be similar to permitting at a second trial, evidence of the verdict of a jury on the first trial of a negligence or assumpsit case. Moreover, the award amounts merely to opinion evidence, with no opportunity to either side for cross-examination.

The duty of the tax assessors is to appraise and assess each property at its market value, and thereafter, if they desire, reduce the market value of each property by a fixed percentage applicable to all properties in the City. See: *Hammermill Paper Co. v. Erie*, 372 Pa. 85, 92 A. 2d 422; *Algon Realty Co. Tax Assessment Appeal*, 329 Pa. 321, 198 A. 49; *Matson's Appeal*, 152 Pa. Superior Ct. 424, 33 A. 2d 464; *Rohrbach Tax Assessment Case*, 156 Pa. Superior Ct. 283, 40 A. 2d 142. The Authority contends that since it can establish both the assessment and the fixed percentage by which the market value has been reduced to obtain the assessed value, the assessment should be admissible in evidence when followed by proof which will show the actual market value of the property.

The law has long been settled that tax assessments may not be offered in evidence in a condemnation proceeding: *Girard Trust Co., Trustee v. Philadelphia*, 248 Pa. 179, 93 A. 947; *Hanover Water Company v. Ashland Iron Co.*, 84 Pa. 279, 285; *Mifflin Bridge Co. v. Juniata County*, 144 Pa. 365, 22 A. 896; *Miller v. Windsor Water Co.*, 148 Pa. 429, 23 A. 1132; *Marine*

*Coal v. Pittsburgh, McKeesport & Youghiogheny R. Co.,* 246 Pa. 478, 92 A. 688.

The Authority has urged this Court to modify or reverse our prior decisions which exclude the introduction of a Viewer's award and of a tax assessment, and also to permit a real cross-examination of real estate experts on the subject of sales of similar properties in the neighborhood for the purpose of determining or fixing the market value of the property in suit, irrespective of whether the experts have or have not considered or relied upon such sales. We can appreciate the feelings possessed by many counsel who are greatly restricted by the decisions of this Court in their cross-examination of expert witnesses in this class of case; especially when the testimony appears to be unbelievable and inexplicable. A typical example may be found in *Lutz v. Allegheny County,* 327 Pa., supra, where one expert testified to a market value of $15,500. and another expert to a market value of $129,000. for the very same property, as of the very same date. Such testimony makes the opinion evidence of real estate experts in condemnation proceedings appear at times not only unreliable but ridiculous* and the ascertainment and enforcement of justice very difficult. Nevertheless, in view of the fact that any relaxation of our settled rulings and principles, or the modification or reversal of a score of prior decisions—which for nearly a hundred years have fixed definite limitations and

---

* ". . . opinion evidence in land damage cases is often the most conjectural, unreliable and lowest kind of evidence ever allowed in a Court of justice: Cf. Phillips's Estate, 299 Pa. 415, 423, 149 A. 719; Snyder's Estate, 279 Pa. 63, 74-5, 123 A. 663": *Crumrine v. Washington County Housing Authority,* 376 Pa. 234, 241, 101 A. 2d 676. See also *Leaf v. Pennsylvania Co.,* 268 Pa. 579, 584, 112 A. 243, where one expert testified to a value of $4000. and another placed the value at $160,000.

boundaries to the examination and cross-examination of real estate experts in this class of case,*—would open wide the door to many collateral issues, a majority of this Court believe that we should make no change in our decisions or in the principles heretofore established.

We have considered, but deem it unnecessary to discuss, all of the other contentions raised by each of the parties.

The judgment of the Court of Common Pleas is reversed and a new trial granted.

Mr. Justice CHIDSEY concurs in the result.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

The decision in this case is bound to produce grave injustices to owners of private property in the ascertainment of damages due them for the taking of their properties under eminent domain. The majority opinion repudiates the well-established and long-respected rule that in an action for damages for the appropriation of private property for public use evidence of what the owner paid for the property or what he was willing at an earlier time to sell it for is not admissible *to affect the value of the property at the time of the taking.* So far as such evidence has been deemed admissible, it has been for another purpose and, then,

---

* On the subject of proper and improper examination and cross-examination concerning sales in the neighborhood, see: *Girard Trust Co., Trustee v. Philadelphia*, 248 Pa. 179, 93 A. 947; *Greenfield v. Philadelphia*, 282 Pa. 344, 127 A. 768; *Rea v. Pittsburg & Connellsville Railroad Company*, 229 Pa. 106, 78 A. 73; *McSorley v. Avalon School District*, 291 Pa. 252, 139 A. 848; *East Brandywine & Waynesburg R. R. Co. v. Ranck*, 78 Pa. 454; *Houston v. Western Washington R. Co.*, 204 Pa. 321, 54 A. 166; *Kaufman v. Pittsburg C. & W. R. Co.*, 210 Pa. 440, 60 A. 2.

only in exceptional and rare instances as we shall hereinafter see.

The majority, however, state that "Generally speaking, an owner of property may be asked what he paid for the property and similarly the price at which he offered to sell the property, if the purchase or sale was not too remote" and cite in support of that statement four cases, viz., *East Brandywine and Waynesburg Railroad Co. v. Ranck*, 78 Pa. 454; *Lutz v. Allegheny County*, 327 Pa. 587, 195 A. 1; *Rea v. Pittsburg & Connellsville Railroad Company*, 229 Pa. 106, 78 A. 73; and *Greenfield v. Philadelphia*, 282 Pa. 344, 127 A. 768.

The expression in the *Lutz* case, supra, relied on by the majority was a palpable dictum, as will appear, and the *Brandywine* case was later significantly limited. The *Rea* and *Greenfield* cases are exceptions to the general rule and do not support the proposition which the majority opinion lays down. In fact, it had been my understanding and belief that we had appropriately isolated those cases to their intended limited sphere when we lately reviewed them in our unanimous opinion in *Berkley v. Jeannette*, 373 Pa. 376, 379-381, 96 A. 2d 118. But, now, by a divided court with a majority of one, the exceptions are again dragged forth to support a general rule for which they are not authority. Thus, our pronouncement in the *Berkley* case that "Introduction of the purchase price is not permitted . . . in order to influence, by comparison, the jury's determination of the property's value at the time of the condemnation" is summarily overruled although as recently as *Avins v. Commonwealth*, 379 Pa. 202, 108 A. 2d 788, we said that in the *Berkley* case "we indicated the circumstances under which the claimants' deed for the property involved in a condemnation proceeding may be admitted in evidence or

inquired into at a trial of the issue as to the amount of the damages suffered."

The *Brandywine* case, supra, decided in 1875, did hold that the owner's offer of his property for sale "at a fixed price and a sale of a portion of it were facts proper to go to the jury as constituting his estimate of its value." That case was thereafter cited once by this court (168 Pa. 27) on another point, not here pertinent, and, again, in *Houston v. Western Washington Railroad Company*, 204 Pa. 321, 325, 54 A. 166 (1903), for its holding as above set forth. The *Houston* case, however, has never been cited in any decision by either of our appellate courts. The *Brandywine* case was also cited once by the Superior Court in *Orr v. Carnegie Natural Gas Company*, 2 Pa. Superior Ct. 401, 410 (1896), with respect to its statement that an owner's declarations against interest respecting the value of his land are admissible in evidence against him. But, the rule of the *Brandywine* case was deliberately and considerably restricted by this court in the *Rea* case, supra, in 1910 where it was said with specific reference to the *Brandywine* case that "The fact that the plaintiff had offered to sell his farm at a certain price did not fix its value, but *under the circumstances of that case* we viewed it as some evidence to go to the jury . . ." (Emphasis supplied). Could a case be more exceptional than one whose ruling is expressly limited to "the circumstances of that case"? Nor is it without significance that the *Brandywine* case has never again been cited by this court in the forty-four years since the *Rea* opinion *until the majority opinion in the instant case.*

The *Rea* case, itself, was an intentional and calculated exception to the general rule that, on the trial of an issue in a condemnation proceeding as to the value of the property at the time of its appropriation,

the owner may not be cross-examined as to what he had paid for the property. The opinion in the *Rea* case makes that plain beyond cavil. In the *Rea* case, one of the plaintiffs testified to a valuation for the appropriated land of $1,056,000. Counsel for defendant sought to cross-examine the witness as to what his father had paid for the property just two years and nine months before the condemnation and also sought "to show that there was no such increase in the market value of the property between June, 1900, and March, 1903, as would be indicated by the price paid for the property in June, 1900, and the estimate now given by the witness of its market value in March, 1903." The offers were objected to "as not cross-examination, immaterial, irrelevant and incompetent"; and the objection was sustained. "The defendant made practically the same offer in its case in chief." The price paid for the *Rea* property, as shown by the deed in evidence, which was limited to proving the grantee's title, was $140,000. The jury returned a verdict for the plaintiffs for $775,133.33 which the parties agreed was composed of $616,000 principal and $159,133.33 compensation for delay in payment.

On appeal, the rulings on the offers, as above stated, were assigned for error. Mr. Justice Moschzisker said for a unanimous court that "The offers as a whole were properly refused. They contain too many points collateral to the main one sought to be proved, and the proffered evidence was not part of the defendant's case in chief." The foregoing ruling obviously embraced the offer to cross-examine the witness as to what the grantee had paid for the property. However, the learned Justice immediately went on to say,—"But after serious consideration we have reached the conclusion that *under the peculiar facts of this case* the question as to the purchase price of the property in

June, 1900, was proper cross-examination and should have been allowed" (Emphasis supplied). Again, could the exceptional status of the decision have been more clearly indicated?

Counsel in the *Rea* case were among the ablest of the leading lawyers of Allegheny County at that time. If defendant's counsel had a decision holding that, ordinarily, cross-examination as to what the condemnee had paid for the appropriated property was admissible on the question of damages, would they not have immediately advanced it? And, if there were such a rule, would not Mr. Justice MOSCHZISKER, who was widely recognized as extremely well versed in the rules of law and evidence, have at once directly held that the proffered cross-examination was proper in such cases as a matter of a condemnor's right in general instead of tying the decision to "the peculiar facts of this case"? And, what were "the peculiar facts"? The fact that the plaintiff witness was claiming a value of $1,056,000 for the land alone and the further fact that his ancestor had paid only $140,000 for both the land and buildings only two years and nine months before. Among the reasons given by Mr. Justice MOSCHZISKER for allowing the cross-examination as to what the grantee had paid for the property was "the disparity between the price paid and the value claimed".

Furthermore, whether such cross-examination is proper in a given instance is always a question for the trial judge to resolve in the exercise of his discretion. As was further said in the *Rea* case, supra (p. 120),— "under the circumstances of this case, while the testimony sought to be elicited by the question propounded to the claimant concerning the price paid for the land would not fix the value of the property, it would be some evidence to be considered in weighing his opinion as to its value . . . . Where such testimony is of-

fered the question of its acceptance or rejection will necessarily depend upon the circumstances in each particular case, the disparity between the price paid and and the value claimed, the length of time between the sale and the appropriation, and other elements which may present themselves tending to show the worth of the testimony as evidence affecting the importance, and throwing light upon the accuracy and good faith, of the opinion expressed by the witness. *Therefore the question will always be one for the exercise of discretion on the part of the trial judge*" (Emphasis supplied).

The decision in the *Rea* case has since been cited only once to justify a trial court's having permitted the cross-examination of the owner in a condemnation proceeding concerning what he had paid for his property. That was in *Greenfield v. Philadelphia,* supra. The *Greenfield* case is truly *sui generis.* There, the condemnation was not of an entire property to which the purchase price as a whole bore relation. The appropriation embraced no more than a strip 5 feet in width across the frontage on Chestnut Street of a plot of ground situate at the southwest corner of Chestnut and 15th Streets in Philadelphia. The lot fronted 79.2 feet on Chestnut Street and ran back, preserving an even width throughout, for a distance of 142.08 feet to Ionic Street. The lot had erected upon it a then obsolete hotel. Greenfield had acquired this property and a smaller lot directly across Ionic Street by deed dated March 6, 1922, in pursuance of his agreement of purchase of December preceding. The total consideration for the two properties was $1,887,500 of which, according to the purchaser, $1,762,500 represented the purchase price of the Chestnut Street property. The existing structures on that property were razed by the new owner who, on January 2, 1923, obtained a per-

mit to construct a twenty-story building on the Chestnut Street lot. However, because of an ordinance of the City of Philadelphia of *March 31, 1884,* which widened Chestnut Street from 50 to 60 feet, the owner was obliged to keep his new building back 5 feet from the old Chestnut Street building line.

Deeming the City's appropriation of the 5-foot strip to have taken place on January 2, 1923, the date of the issuance of the building permit for the new structure—an idea, incidentally, which the City Solicitor appears also to have entertained—Mr. Greenfield instituted a viewers proceeding for the assessment and award of damages allegedly suffered by him through the City's effectuated appropriation of the 5-foot strip within the 60-foot street width laid out by the ordinance of 1884. The viewers awarded the claimant $40,158.24, and the City appealed to the Court of Common Pleas. At the trial of the issue in the Court of Common Pleas the valuations for the property immediately before and immediately after the condemnation, as testified to by the experts on both sides (on the assumption that the date of the taking was January 2, 1923), had no identifiable significance to the damage, if any, due to the widening of the Chestnut Street sidewalk by 5 feet in 1923. In the course of the trial, the court permitted the City to cross-examine the owner relative to what he had paid for the Chestnut Street property upon taking title thereto just nine months before. The owner's real estate experts variously testified to a valuation for the property, minus the 5-foot strip, as of January 2, 1923, from, respectively, $120,000 to $780,000 more than he had paid for it. The City's experts testified that the property (especially for a tall office building use) had been benefited more than it had lost by the reduction in area occasioned by the widening of the Chestnut Street sidewalk by 5 feet and that, conse-

quently, the owner had not been damaged. The jury returned a verdict for the defendant City on which judgment was entered.

The owner appealed and assigned for error, inter alia, the trial court's having permitted the defendant to cross-examine him with respect to what he had paid for the property. This court affirmed, citing *Rea v. Pittsburg & Connellsville Railroad Company*, supra. The fact of the matter is that the *Rea* case is in no sense analogous. There were no "peculiar facts" in the *Greenfield* case as there were in the *Rea* case justifying such cross-examination. In short, there was no patent "disparity between the price paid and the value claimed". Moreover, in the *Rea* case, the whole of the property to which the purchase price related was taken whereas, in the *Greenfield* case, the 5-foot strip appropriated was but three and a half per cent of the area of the whole lot to which the purchase price applied. Nevertheless, the *Rea* case was cited to justify the cross-examination which, presumably, produced the verdict for the defendant. Thus, a rule expressly intended for application only in exceptional circumstances was applied to a case without exceptional circumstances. If Mr. Greenfield was damaged by an appropriation of the front 5 feet of his Chestnut Street lot for a public improvement, he had a constitutional right to be paid for it. On that basis, the permitted *cross*-examination was harmful error. However, it is not clear that the plaintiff had a claim for damages. Cf. *Berkley v. Jeannette*, supra. He had bought with knowledge that, by virtue of the 1884 ordinance, he could not erect a new structure on the front 5 feet of his lot. That inhibition was undoubtedly reflected in a reduced purchase price.

The *Greenfield* case has since been cited twice in support of the proposition that, in a condemnation pro-

ceeding, the owner may be asked on cross-examination what he paid for the property if the time of the purchase is not too remote: see *Goodman v. City of Bethlehem,* 323 Pa. 58, 69, 185 A. 719 (1936), and *Lutz v. Allegheny County,* 327 Pa. 587, 590, 195 A. 1 (1937). In the *Goodman* case, the condemnor was denied the right so to cross-examine the owner who had purchased the property about a year before the taking. On appeal, this court affirmed the ruling in an opinion by Mr. Justice STERN who said that, under the facts of that case (viz., an exchange of properties), the proposed cross-examination would have "necessitated an investigation into the value of these other properties which would undoubtedly have been confusing to the jury." In the *Lutz* case there was actually no attempt to cross-examine the owner as to what he had paid for the 78-acre farm of himself and wife which the county condemned for a public purpose. The nearest counsel for the county came to inquiring into the purchase price was when the husband, who had testified to a value for the buildings on the farm in excess of $11,000, was asked whether that was not more than he had paid for both land and buildings seven years before. On appeal to this court the question was held to have been harmless as the price which the husband had paid for the farm had come out in the plaintiffs' case through one of their own witnesses. This court went on, however, by way of a pure gratuity, to add that "Moreover, plaintiff could have been asked on cross-examination the direct question as to what he had paid for the property [citing] *Greenfield v. Phila.,* 282 Pa. 344, 127 A. 768." Thus, what had begun as a very restricted rule in the *Rea* case became, with only one case intervening (viz., *Greenfield v. Philadelphia*), a general rule by way of a dictum in the *Lutz* case. And, while it is of no present moment, a reading of the *Lutz* case will con-

vince that it abundantly supplied the "peculiar facts" necessary to make the rule of the *Rea* case applicable.

Until the present decision there has been no general rule in this State permitting the cross-examination of the owner in a condemnation proceeding as to the price he had paid for the appropriated property. Whether the given case is exceptional, that is, presents the "peculiar facts" which make cross-examination of an owner as to what he paid for the condemned property proper, is, as Mr. Justice MOSCHZISKER said in the *Rea* case, "always . . . one for the exercise of discretion on the part of the trial judge." But, in addition to that, whether the particular purchase or sale is too remote to be of any evidentiary value is, as the majority opinion concedes, also a matter calling for an exercise of the trial court's discretion.

The evident fallacy in the majority's review of the trial court's exercise of its discretion in the instant case lies in its misconception that *remoteness* of evidence is to be determined exclusively on the basis of an arbitrary time relationship. Such is not the intent of the rule. In an opinion for the Court of Appeals of New York, in which Judge CARDOZO concurred, it was said that "Remoteness, [of evidence] . . . does not necessarily result from mere lapse of time, which is not necessarily an element of it. Its essence is such a want of open and visible connection between the evidentiary and the principal facts that, all things considered, the former are not worthy or safe to be admitted in proof of the latter. . . . The question of remoteness, to be decided in the first instance by the trial judge, as already stated, must depend upon all the considerations, including time, the character of the evidence and all the surrounding circumstances which in his opinion ought to have a bearing upon its worthiness to be brought into the consideration and deter-

mination of the matter in contention": *People v. Thompson*, 212 N. Y. 249, 254, 255, 106 N.E. 78. See also *State v. Kelly*, 77 Conn. 266, 269, 58 A. 705, where, to similar effect, the Supreme Court of Connecticut said that "Remoteness as applied to evidence is a term which has regard for other factors than mere lapse of time, even where it is a factor, as it often is not." That being so, the question of remoteness is, perforce, one for the trial judge to determine initially in the exercise of a broad discretion in the conduct and course of the trial. Consequently, unless trials are to become fleeting and ineffectual episodes, an exercise of judicial trial discretion is not to be rejected or disturbed on appeal "save for manifest abuse": *Thompson v. American Steel & Wire Company*, 317 Pa. 7, 11, 175 A. 541. See, also, *Commonwealth v. Dress*, 354 Pa. 411, 413-414, 47 A. 2d 197; *Ferreira v. Wilson Borough*, 344 Pa. 567, 574-575, 26 A. 2d 342; and *Kaplan v. Loev*, 327 Pa. 465, 469-470, 194 A. 653. And, in the present instance, there was no *such* abuse of discretion, as a brief review of the factual situation will readily reveal.

On June 27, 1946, John Berger, the husband-plaintiff, purchased the property in question which was located on the Boulevard of the Allies in the downtown section of Pittsburgh popularly known as the "Golden Triangle". About a year later, viz., on July 19, 1947, at a time when foreclosure of a defaulted mortgage on the property was threatened, Berger contracted to sell the property to one Speer for a consideration of $36,-000. The proposed sale was never consummated, however, due to the inability of the buyer to finance his purchase. Thereafter, title to the property became vested in Berger and his wife as tenants by the entireties. On February 28, 1951, the Berger property was one of a number of properties condemned by the Pub-

lic Parking Authority of Pittsburgh. Meanwhile, unusually rapid and unprecedentedly extensive building activity in Pittsburgh served to enhance the value of real estate in the "Golden Triangle". The land in that area available for private uses (business and otherwise) had become more and more limited due to the physical constrictions of the section imposed by two converging rivers and a topographical barrier from one river to the other back some distance from the confluence. The natural relative scarcity of privately usable property within the particular area was still further intensified by increased appropriations of land for public uses. Indeed, the testimony of the Parking Authority's own real estate witnesses fully confirmed the sudden and continuing increase in the value of real estate in downtown Pittsburgh.

The Board of Viewers awarded the Bergers $54,-560 as damages for their property. From that award, both the property owners and the Parking Authority appealed to the Court of Common Pleas. At the ensuing jury trial, the court refused to permit the defendant either to cross-examine Berger with reference to the Berger-Speer contract of 1947 or to allow independent introduction of the contract on the ground that the matter sought to be elicited was *too remote*. The jury returned a verdict in favor of the plaintiffs for $64,385, certainly not an unconscionable sum when you consider that there was an additional year and two months delay in payment since the viewers' award and a witness for the defendant conceded a value of $45,000 for the property at the time of the taking.

The fact of the rise in real estate values in the "Golden Triangle" between 1947 and 1951 having been established, it could not properly be ignored by the trial judge in passing upon the question of the remoteness of the Berger-Speer contract of 1947 in relation

to the issue on trial, viz., the market value of the condemned property in 1951. The fact of the matter is that the remoteness of the evidence stemmed not from lapse of time but from the pronounced intervening conditions which had greatly increased land values. Such change well justified the trial judge's exercise of his discretion when he excluded as irrelevant and immaterial, because of remoteness, the price at which Berger would have sold the property nearly four years before the taking. Yet, the majority opinion, on the basis of lapse of time alone, convicts the trial court of error.

Remoteness of evidence, it needs be repeated, is a matter within the exercise of the trial court's sound discretion. The language of Mr. Justice LINN in *Thompson v. American Steel & Wire Company,* supra, at p. 11 has peculiar significance here,—"A trial judge is necessarily vested with adequate power to control the course of the trial, limited only by statute or constitutional requirements . . . . He is constantly faced with questions on evidence in their special relation to the issue to be tried. He must deal with such questions in the light of the purposes of the ultimate inquiry and does so in the exercise of what is known as judicial discretion. He should see that nothing relevant is excluded, so long as its admission will not unduly distract the attention of the jury from the main inquiry, by first requiring the ascertainment of an unnecessary quantity of subordinate facts from which the main inferences would ultimately be made. His conclusion or decision on such points will not be interfered with on appeal save for manifest abuse of power. He must, therefore, determine in the first instance whether evidence which, though logically relevant on the ultimate issue, may nevertheless be excluded, because its general effect on the trial will be to confuse

the issue by distracting the attention of the jury from the primary to collateral issues . . . ."

It is little less than appalling to contemplate the Pandora's Box of trial ills which the current decision will unlid. Proofs of countervailing collateral matter will follow the introduction of collateral matter; confusion of the issue on trial will be worse confounded; and litigation over damages for land taken by condemnation will become truly interminable. The very type of evidence which was specifically ruled out in the *Rea* case, supra, as containing "too many points collateral to the main one" will now be relevant and material.

Finally, the majority opinion states that "The cross-examination sought and the evidence offered by the Authority was particularly allowable, competent and relevant in the present case" for the purpose of impeaching the credibility of the testimony of one of the expert witnesses produced by the owners. For such purpose, the evidence would manifestly be collateral. Accordingly, the trial judge cannot be justly held to have committed reversible error by excluding it. The exclusion of collateral matter is so much within the discretion of a trial court as, virtually, to be unreviewable on appeal save for what clearly amounts to palpable error. Prudent and experienced trial judges are ever cautious not to permit, under the guise of impeaching a witness's credibility, cross-examination as to collateral matter which, of itself, may have a direct bearing on the issue being tried.

I would affirm the judgment for the plaintiffs.

Mr. Justice ALLEN M. STEARNE joins in this dissenting opinion.

Mr. Justice MUSMANNO dissents.