## Margolin v. The Pennsylvania Railroad Company

*Blank, Steinberg, Balder & Steinbrook,* for plaintiffs.

*William H. Lowery, Philip Price* and *Barnes, Dechert, Price, Myers & Rhoads,* for defendant.

BROWN, JR., P. J., August 18, 1959.—This case is before the court en banc on the motion of plaintiffs for a new trial. Plaintiffs, the present owners of the Commercial Trust Building, Philadelphia, brought this action in trespass to recover damages alleged to have been sustained when defendant closed and demolished its Broad Street Station and removed a footbridge over Market Street from the train floor of the station to the Commercial Trust Building.

This footbridge was constructed pursuant to an ordinance of the City of Philadelphia of June 9, 1900, entitled "An ordinance to improve the facilities for and safety of public travel by authorizing the widening of certain streets south of the Pennsylvania Railroad Company's Broad Street Station, and the construction of a bridge across Market Street connecting therewith."

On February 14, 1901, an agreement was entered into between the Pennsylvania Railroad Company and the Commercial Trust Company, which, at that time, was the owner of the property at the southeast corner of Market and Fifteenth Streets, and, thus, was one of plaintiffs' predecessors in title. In that agreement, it was provided, inter alia, that "The Railroad Company is about to construct, under its corporate power, with the assent of the City of Philadelphia, a bridge from the train floor of its Broad Street Station, on the north side of Market Street, to the building line on the south side of the last named street, and there connect said bridge, by steps and approaches on private property, with the public sidewalk along the east side of Fifteenth Street as described in the fifth section of an ordinance of said City . . . AND WHEREAS, The said private property, located at the southeast corner of Market and Fifteenth Streets, is owned by the Trust Company, which proposes to erect a build-

ing thereon, and desires to have said bridge connected with said public sidewalk by means of steps and approaches to be constructed within and as part of said building, in accordance with the two plans hereto attached, made part hereof, and marked respectively 'Exhibit A' and 'Exhibit B,' and the Trust Company believing that the construction and maintenance of said bridge and approaches will increase the rental value of its said proposed building and will be otherwise to its advantage;

"Now therefore this agreement witnesseth, that in consideration of the premises, and of the sum of one dollar by each of the parties hereto to the other paid at and before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, the parties hereto covenant and agree as follows:

"FIRST. The said Trust Company hereby grants to the Railroad Company the right to construct and maintain said bridge, with the necessary supports therefor, over the portion of its fee under the cartway and sidewalk of Market Street, and to attach the southern end of said bridge to, and support it by, the building which is about to be constructed by the Trust Company on its property situated at the southeast corner of Market and Fifteenth Streets. The said Trust Company hereby agrees to erect and maintain, and keep at all times in good repair at its own expense, in its said proposed new building approaches to said bridge from said sidewalk, in the manner shown upon the said plans hereto attached and made part hereof, and to keep said approaches open at all times for the use of such persons as the Railroad Company shall desire to have pass over said bridge; and that in the event of said Trust Company failing to make repairs to such approaches necessary in the judgment of the Railroad Company, after thirty days notice

from the Railroad Company so to do, the Railroad Company may make such repairs and collect the cost thereof from the Trust Company. Should any changes in said approaches be requested by the Railroad Company, the Trust Company will make the same at its own expense. And, in the event of the Trust Company desiring to rebuild or make changes in its said building it shall only do so in such manner as will secure at all times such approaches to the said bridge as shall be satisfactory to the Railroad Company. Said Trust Company hereby releases and discharges said Railroad Company from all claims, demands and payments of money and right to compensation for or on account of any and all damages by reason of the location, construction, maintenance and use of the said bridge and of the said approaches thereto with the necessary supports and appurtenances.

"SECOND. It is mutually agreed that the Railroad Company shall have the policing, management and supervision of the said bridge and approaches thereto; and shall have the right to construct, maintain and use in and about said approaches the necessary facilities for accommodating its passenger travel.

"THIRD.The covenants and agreements of the Railroad Company herein shall bind its successors and shall inure to the benefit of the successors of the Trust Company and the covenants and agreements of the Trust Company herein shall, as perpetual covenants running with the land, bind the successors in title of the Trust Company to the premises aforesaid and shall inure to the benefit of the successors of the Railroad Company."

On July 15, 1936, another agreement was entered into between the Pennsylvania Railroad Company and Arcade Real Estate Company, which, at that time, was the owner of premises situate at the southeast

corner of Fifteenth and Market Streets. That agreement, after reciting the ordinance of the City of Philadelphia approved June 9, 1900, and the agreement of February 14, 1901, pertaining to the bridge across Market Street, provided that ". . . said Real Estate Company . . . has requested said Railroad Company to give up and surrender to it the rights and privileges granted by said Agreement in and to the north stairway approach, situate along the southerly side of said Market Street, leading from and to the sidewalk level on said easterly side of Fifteenth Street, to and from the landing at the top of the stairs in the main entrance hall on the train or first office floor of said building which was constructed on said property, said landing forming part of the approach to said bridge; which said Railroad Company has agreed to do upon the following terms and conditions:

"WITNESSETH, that in consideration of the premises and the sum of ONE DOLLAR by each of the parties hereto to the other paid, at or before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, the parties hereto covenant and agree as follows: (First) Said Railroad Company agrees that the terms of said Agreement of February 14, 1901 shall be, and are by these presents, modified to the extent and to the effect that it, said Railroad Company, gives up and surrenders to said Real Estate Company the rights and privileges to said north stairway approach, situate along the southerly side of said Market Street, leading from and to the said sidewalk level on said easterly side of Fifteenth Street, to and from the landing at the top of the stairs in said main entrance hall on the train or first office floor of said building; (Second) Said Real Estate Company covenants and agrees to and with said Railroad Company to maintain and keep in good repair at all times, at its own expense in said building, the southerly stairway approach

leading from and to said sidewalk to and from said landing, and said landing; and further covenants and agrees to and with the said Railroad Company that all agreements, liabilities, obligations, terms and conditions of said agreement dated February 14, 1901, excepting as to the said north stairway approach, shall remain and be in full force and effect; and (Third) said Real Estate Company covenants and agrees to and with said Railroad Company, that it, said Real Estate Company, shall and will, at all times hereafter, indemnify and save harmless said Railroad Company from and against any and all detriment, damage, losses, claims, demands, suits, costs, or expenses which said Railroad Company may suffer or sustain or be subjected to, directly or indirectly, by reason of the removal of said north stairway approach and the construction, maintenance and use of other facilities of said Real Estate Company on and within the area covered by said north stairway approach.

"The covenants and agreements of said Real Estate Company herein contained shall, as perpetual covenants running with the land and premises aforesaid, bind not only said Real Estate Company, but its successors and assigns, and shall inure to the benefit of the successors and assigns of said Railroad Company."

Pursuant to the agreement of 1901, the Commercial Trust Company erected approaches to the footbridge from the sidewalk as provided for in the contract, including granite stairways and a concourse or passageway from the stairs to the footbridge. From 1902 until 1952 the footbridge, stairs and passageways were used by a large number of the public, who were passengers of defendant's railroad, going to and coming from defendant's trains and the sidewalk on the east side of Fifteenth Street, south of Market Street. In addition, the footbridge, the approaches and passageways thereto in the Commercial Trust Building were used

daily by many tenants of and visitors to the Commercial Trust Building in coming and going between the said building and defendant's railroad station. There was no monetary or cash consideration paid by either party to the other in connection with the agreement of 1901. On or about April 27, 1952, the footbridge was closed, and subsequently demolished.

At the trial, it was agreed that since the facts bearing upon the question of defendant's liability were not in dispute, that question would not be submitted to the jury, that the sole question to be submitted to the jury was the determination of whether plaintiffs suffered any damages as a result of the closing and demolition of the footbridge, and if so the amount of such damage. It was found by the jury that plaintiffs suffered no damage as the result of the closing and demolition of the footbridge by defendant.

As reasons for a new trial, plaintiffs assign, in addition to the usual reasons, that the verdict was against the evidence, the law, and the charge of the court, a number of rulings on the evidence and instructions to the jury. Of course, if the record fails to disclose a legal basis for the imposition of liability on defendant, in that plaintiffs have not made valid cause of action, a new trial should not be granted even if there were errors at the trial: Kuhler v. Harrison Construction Company, 361 Pa. 100, 104; Fornelli v. Penna. R. R. Co., 309 Pa. 365, 369; Matevish v. Ramey Borough School District, 167 Pa. Superior Ct. 313, 322. Consequently, it is necessary to determine whether there is a valid basis for recovery by plaintiffs. A careful examination of the agreement entered into by the parties in 1901 provides no basis for plaintiffs' recovery. That agreement required the trust company to build approaches to the bridge from the sidewalk. It should also be noted that the railroad company was required to police, manage, maintain and supervise the

bridge and approaches thereto. While it is true that the agreement recited the belief of the trust company that the construction and maintenance of the bridge would serve to increase the rental value of the proposed building, this recital, along with the entire agreement, must be subjected to analysis and interpretation. It is readily apparent that the agreement does not specifically provide that the railroad company undertook never to remove the bridge, nor did it contract never to remove its railroad station. Thus, if its action in demolishing the bridge and the station are to serve as a breach of its contractual obligation, this must be implied as part of the contract. No reasonable construction of the agreement would permit such a reading of the contract. There is no doubt that defendant agreed to construct and maintain the bridge. However, it did not agree to maintain its station at the same location forever, nor did it agree to maintain the bridge after the removal of the station. Plaintiffs are correct in their contention that "Contracts must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, if that intention can be ascertained from their language. Where the language of a contract is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred. If one construction would make it unreasonable, while another would do justice to both parties, the latter will be adopted": Percy A. Brown & Co. v. Raub, 357 Pa. 271, 287.

When the principles for the interpretation of contracts are applied to the facts of the present case, it

must be concluded that the construction asserted by plaintiffs may not be adopted. Some light is shed on the intentions and purposes which went into the agreement of 1901 by the minutes of the meeting of defendant's board of directors on June 13, 1900. In those minutes it was said to be "advantageous, and suited to promote the convenience of the inhabitants of the City and County of Philadelphia, and the interests of this Company, and particularly to improve the facilities for, and the safety of, public travel from, to, on and in connection with its railroad, that an overhead bridge shall be constructed from its Broad Street Station across Market Street immediately east of Fifteeenth Street . . ." These minutes, which are in the record, indicate that at least insofar as defendant was concerned, the whole purpose of the bridge was to improve the access to its station. That being so, it would be absurd and unreasonable to construe the agreement to require defendant to maintain its station indefinitely, and even more incorrect to hold that the parties agreed that the bridge was to be maintained even if the station had ceased to exist or that defendant was to be answerable in damages in the event of its removal.

Moreover, when proper standards of contract interpretation are applied to determine the intention of plaintiffs' predecessor in title in 1901 when the agreement was entered into, a similar result is reached. It is significant that the agreement states that the trust company believed that the rental value of its then proposed building would be enhanced by the construction of the bridge. A natural interpretation of this provision would indicate that the factor which would lead to the increased rental value of the building was the improved access to the railroad station, and construing the contract as granting rights to plaintiffs in the absence of a railroad station at the site would be meaningless. A natural, just, reasonable and equitable con-

struction of the contract makes it manifest that what was agreed by the parties was that each of them was to undertake certain duties and obligations in order that a bridge exist for the mutual benefit of the parties for so long as a railroad station was located at one end of the structure. It is clear that the existence of the Broad Street Station was in the contemplation of the parties necessary for the performance of the contract. When that structure was destroyed, the performance of the agreement pertaining to the bridge became impossible and its object frustrated: Cf. Restatement, Contracts, §§288, 460.

Where a contract involved the use of canal boats, the subsequent abandonment of the canal excused both parties from further performance of the contract, "and giving cause of action to neither": Wertz v. Klinger, 25 Pa. Superior Ct. 523, 526.

Since the existence of the Broad Street Station was essential to the carrying out of the purpose of the contract, it was a condition "implied by law, just as though it were written into the agreement," that the destruction of the station would end the contract: West v. Peoples First National Bank & Trust Company, 378 Pa. 275, 282; Greenberg v. Sun Shipbuilding Co., 277 Pa. 312, 315, 316; Ward v. Vance, 93 Pa. 499-512.

It was not shown, nor is it contended, that defendant was at fault in any way in its action in causing the removal of the railroad station. Hence, if liability is to be attributed to defendant because of the removal of the bridge, it must be because of some contractual or other legal obligation not to remove it. There is nothing in the agreement of 1901 or in the contract of 1936 between defendant and plaintiffs' predecessors which could reasonably be construed as evincing an intention to impose liability on defendant in the event of the removal of Broad Street Station.

Plaintiffs assert that their right to recover may be based upon the existence of an easement giving them the right to require defendant to maintain the bridge, or if it fails to do so, to pay plaintiffs for damages suffered. "An easement is said to be a liberty, privilege or advantage, without profit, which the owner of one parcel of land may have in the lands of another; or, to state it from the opposite point of view, it is a service which one estate owes to another, or a right or privilege in one man's estate for the advantage or convenience of the owner of another estate": Ritter v. Hill, 282 Pa. 115, 121; Perkinpine v. Hogan, 47 Pa. Superior Ct. 22, 25.

It is contended that an easement by prescription was created by virtue of the fact that some of the persons who utilized the bridge came from plaintiffs' building and went to the sidewalk on the north side of Market Street. Of course, where "the use is with the knowledge and acquiescence of the owner of the land traversed, and is under his leave and favor, and at his will, no title by prescription can arise": Zerbey v. Allan, 215 Pa. 383, 389-390.

It does not follow from the fact that all of the persons using the bridge may not have been passengers of the railroad, that an easement by prescription was thereby created in plaintiffs' favor. At the very outset, it must be noted in this connection that it was obviously contemplated by the parties to the agreement of 1901 that the bridge was to be used by persons to go to and from plaintiffs' building. This is clear from the access to the building that was provided in the plans for the original construction. Moreover, there is nothing in the contract which provides that the bridge was only to be used by passengers of the railroad.

Even if it were established that an easement was somehow created whether by grant or by prescription, there is nevertheless a basic and fundamental principle which bars recovery by plaintiffs. That doctrine requires that an easement must be held to terminate when its purpose no longer exists: Riefler & Sons v. The Wayne Storage Water Power Company, 232 Pa. 282, 291-292. There can be little doubt that the right of way over the bridge, in the instant case, was incidental to the railroad station. Thus, when the station ceased to exist, the right of way, if any, "altogether ceased": Baltimore and Ohio Railroad Company v. Bond, 345 Pa. 360, 363. "The rule generally followed, in the absence of any agreement to the contrary, is that an easement in a building or other artificial structure, not coupled with an interest in the land, is extinguished by the destruction of the building or structure. The reason is that the easement is only in the building and not in the soil": 17A Am. Jur., Easements, §167. In Union National Bank of Lowell v. Nesmith, 238 Mass. 247, where two adjoining buildings were erected in 1852 with a common entrance, stairways and landings, and a successor in title to one of the buildings proposed to tear it down and erect a new one without making provision for the common entrance and stairways, it was held in 1921 that this could be done, the court holding, on p. 249, that "Where there is an easement of way through a building as distinguished from such right upon and over land without reference to a structure thereon, the incorporeal hereditament is measured and limited by the existence of the structure in which it only can exist and be exercised; and the person owning the easement by the evident intent of the parties has no easement in the servient estate apart from the building. If the structure ceases to exist, the right ends as there is nothing upon which it can be exercised. . . . In the opinion of a majority of the

court, the easement is also lost when the building is destroyed by the intentional act of the owner of the servient estate. The person entitled to such right has no interest in the land as such."

It should be noted that in the instant case, the bridge was almost entirely outside of the building to which it was attached, and furthermore there is no evidence of an intention on the part of defendant to replace the demolished structure with a new one.

It must, therefore, be concluded that there is no valid basis upon which to impose liability upon defendant on account of the removal of the bridge over Market Street between plaintiffs' building and Broad Street Station.

Even if there were a basis in law for the cause of action alleged by plaintiffs, the reasons assigned do not provide sufficient grounds upon which to order a new trial. It is asserted that it was error to admit the testimony of the supervising assessor and real estate assessor of the City of Philadelphia in whose area plaintiffs' building is located. This is premised upon the decisions which hold that tax assessments may not be offered in evidence in a condemnation proceeding: Berger v. Public Parking Authority of Pittsburgh, 380 Pa. 19, 27-28; Marine Coal Company v. Pittsburgh, McKeesport and Youghiogheny Railroad Company, 246 Pa. 478, 493. While this is undoubtedly the law, it is not determinative of the question presented in the present case. Manifestly, this is not a condemnation proceeding. Consequently, the issues are different and the rulings with respect to the admissibility of the evidence need not be the same. Moreover, the testimony of the witness was offered simply to show whether or not there had been a change in the valuation of the building, and not to show what the actual valuation of the building may have been in the years referred to in the evidence.

It is further contended on behalf of plaintiffs that the trial judge erred in admitting into evidence the report and order of the Pennsylvania Public Utility Commission which approved the abandonment of the Broad Street Station. This showed that it was found by the commission that the abandonment of the station was "necessary or proper for the service, accommodation, convenience or safety of the public. . . ." Hence, as hereinabove pointed out, there was nothing improper in defendant's action in causing the removal of the station. Moreover, the ruling was correct. The report and order were attached to the agreed statement of facts. The authority relied upon by plaintiffs is readily distinguishable from this case. In Vandivort v. Pittsburgh, Harmony, Butler & New Castle Railway Co., 249 Pa. 217, 219-20, it was held that a street railway company was responsible in damages where it had specifically contracted to maintain a stop on the premises of a landowner, as partial consideration for its right of way, even though the abandonment of the stop was required for the safe, convenient or economical operation of the railway. Clearly, that decision can have no bearing on the issues in this case because it has not been shown that defendant contracted or obligated itself to retain or maintain a railway station at the location on Market Street, nor did it agree to maintain the bridge subsequent to the removal of the station.

There was no error in admitting into evidence testimony by the supervising assessor for the city and by the appraiser for the mortgagee of plaintiffs' property to the effect that no value was attributed to the bridge in ascertaining the value of the building. These witnesses were qualified experts. They testified in rebuttal to plaintiffs' witnesses who said that the bridge enhanced the value of the building. This testimony was therefore properly admitted. It was also proper

to admit a number of newspaper articles pertaining to the removal of the Broad Street Station by defendant. In this connection, the record shows that plaintiffs first offered evidence of this type. A witness of the plaintiffs testified that there was, in a newspaper of February 22, 1952, the "article which broke the news about the station coming down." Another expert witness testified as to having taken the value of the bridge into consideration in ascertaining the value of the building. In view of this, it was proper to allow evidence of numerous newspaper articles published prior to February 22, 1952, indicating that Broad Street Station was to be demolished.

A new trial is not required because of the introduction into the record of a number of ordinances of the City of Philadelphia pertaining to the improvement projects in the vicinity of the Broad Street Station. These show that defendant's action was proper and lawful.

Testimony as to appraisals made for the mortgagee of the building was admissible. This proof, as in the case of assessments, was admitted for the sole purpose of showing the change, if any, that the removal of the bridge caused in the value of the property. For this material issue, the evidence was admissible. Also material and properly admitted was evidence of major improvements made in and to the building by the owners. This was important to show whether the value of the building was affected by the removal of the bridge or because of other factors. There was admitted evidence of the principal amount of the mortgage. This was part of the proof of the history of the property, in that the premises were purchased by the mortgagee upon default. Even if it could well have been excluded, it furnishes no ground for concluding that plaintiffs were thereby prejudiced so as to entitle them to a new trial.

Finally, a careful examination and analysis of the record leads to the conclusion that the verdict was not against the evidence or the weight of the evidence so as to require the granting of a new trial. While it was shown that substantial expense had been incurred by plaintiffs in closing the opening in the wall which had resulted from the removal of the bridge and making alterations in the building, there was a great deal of proof that the removal of the bridge enabled plaintiffs to utilize additional space for income producing purposes and that the demolition of the bridge did not cause any decline in the value of plaintiffs' property.

Accordingly, a new trial is refused, and judgment is entered for defendant.